IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,     :
                               :        CRIMINAL NO. 4:04-CR-10
        v.                     :
                               :        (Judge McClure)
CHRISTOPHER P. DeSIVO          :

## MEMORANDUM

January 9, 2007

**BACKGROUND:**

On August 25, 2005, a jury in the Middle District of Pennsylvania found

defendant Christopher P. DeSivo ("DeSivo") guilty of four counts related to a

conspiracy to manufacture and distribute methamphetamine, possession of a

firearm, witness tampering, and obstruction of justice.  On October 20, 2005, the

United States Probation Office ("probation office") issued DeSivo's  original

presentence report, which was later updated on February 28, 2006.

The probation office used the 2005 United States Sentencing Commission

Guidelines Manual to determine defendant's total offense level.[1]  Relying on the

trial testimony of several witnesses, the probation office concluded that at least 1.5

kilograms but less than 5 kilograms of methamphetamine was involved in

---

[1]  Pursuant to U.S.S.G. § 1B1.11, we will use the 2006 United States
Guidelines Manual.

defendant's methamphetamine conspiracy.  Pursuant to U.S.S.G. § 2D1.1(c)(3), this amount resulted in a base offense level of 34.  The probation office added eight levels to this amount - two levels for Desivo's possession of a 9mm assault rifle in connection with his drug distribution activities, see U.S.S.G. § 2D1.1(b)(1); four levels for Desivo's role as leader of criminal activity involving five or more persons, see U.S.S.G. § 3B1.1(a); and two levels for DeSivo's obstruction of justice, see U.S.S.G. § 3C1.1.  After determining DeSivo was not entitled to any offense level reductions, the probation office concluded that DeSivo's total offense level was 42.

The probation office then determined DeSivo's criminal history category score, which, based on his extensive criminal history, resulted in a base score of sixteen.  The probation office then added two points because the instant offense occurred while the defendant was on parole, see U.S.S.G. § 4A1.1(d); and added one point because the defendant committed the offense less than two years after being released from imprisonment for a prior conviction, see U.S.S.G. § 4A1.1(e).  The net result was nineteen criminal history points, which meant the defendant's criminal history category was VI.  With a total offense level of 42 and a criminal history category of VI, the presentence report determined DeSivo's sentencing guideline imprisonment range to be 360 months to life.

Not surprisingly, DeSivo has filed numerous objections challenging the basis for this imprisonment range.  On November 2, 2005, DeSivo filed, *pro se*, eleven pages of objections, followed by fifteen pages of supplemental objections filed, again *pro se*, on January 30, 2006.  The probation office filed an addendum responding to these objections.  The court then scheduled a hearing and a briefing schedule for arguments regarding DeSivo's objections.  After granting DeSivo's numerous requests to delay the briefing and hearing, Desivo and the government filed their respective sentencing memoranda, and the court heard arguments on DeSivo's objections on December 6, 2006.  During the December 6th hearing, the parties were given an opportunity to present argument and any evidence supporting those arguments.  Sentencing has been postponed pending the court's ruling on defendant's objections.

**DISCUSSION:**

## I.  Standard for Sentencing

The Supreme Court's ruling in <u>United States v. Booker</u>, 543 U.S. 220 (2005) made the United States Sentencing Guidelines advisory.  Post-<u>Booker</u>, the Third Circuit has directed the district courts to follow a three part process when applying these advisory guidelines:

(1) Courts must calculate defendant's Guidelines sentence in the same manner as

they would have before <u>Booker</u>.

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-<u>Booker</u> case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant 28 U.S.C. § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

<u>United States v. Jackson</u>, 467 F.3d 834, 837 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (quoting <u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir. 2006).

In his *pro se* objections, DeSivo originally objected not only to the Guideline calculations, but also made request for specific departures. <u>See</u> (DeSivo's Obj., Rec. Doc. 196, ¶ 29). During the December 6th hearing, however, defense counsel and the government agreed that those departure requests were not really departure requests, but rather arguments that were relevant to the factors enunciated in 28 U.S.C. § 3553(a). <u>See</u> Obj. Hr'g Tr. 5-, 95-6, December 6, 2006. For this reason, we deal only in this memorandum with step one of the sentencing process, and will consider the objections DeSivo makes with respect to the

4

calculations rendered in the presentence report.  The arguments presented in

DeSivo's *pro se* downward departure requests are rejected in their capacity as

departure requests.  Those arguments, however, will be considered at a future

sentencing hearing in so far as they pertain to the factors in 28 U.S.C. § 3553(a).

## II.  Sentencing Guideline Calculation

DeSivo makes the following four main arguments in challenging the

calculations rendered in the presentence report: (1) the presentence report

impermissibly inflated the amount of methamphetamine attributable to DeSivo, (2)

the presentence report incorrectly attributed a leadership role to DeSivo in the

commission of the methamphetamine conspiracy, (3) the presentence report

incorrectly applied an enhancement for his weapon possession conviction and

obstruction of justice conviction, and (4) the presentence report miscalculated his

criminal history score.[2]  We will discuss each argument in turn, and make an

independent determination as to whether the calculations made in the presentence

report are supported by the evidence.

---

[2] DeSivo has objected to almost every paragraph in the presentence report, including matters having no bearing on his ultimate sentence, such as the docketing number referenced for a prior criminal matter.  For purposes of this memorandum, we rely almost exclusively on the arguments made by defense counsel during oral arguments.  We note that any objection made by Desivo that is not explicitly addressed in this memorandum is deemed overruled.

Before doing so, we note that we are required to apply the preponderance of the evidence standard.  See U.S. v. Cooper, 437 F.3d 324, 330 (3d Cir. 2006).  In his sentencing memorandum, DeSivo argues that a higher standard should apply. This argument is clearly misplaced, as the Third Circuit has as recently as November 2006 reiterated twice that when finding facts to determine the sentencing range under the Sentencing Guidelines, the district courts need only apply the preponderance of evidence standard.  See United States v. Wilson, 2006 U.S. App. LEXIS 27179 at *6 (3d Cir. November 1, 2006) (unpublished); U.S. v. Fowers, 2006 U.S. App. LEXIS 27374, at *5 (3d Cir. November 3, 2006) (unpublished).[3]

1.    Calculation of Methamphetamine Amount

In justifying the amounts of methamphetamine attributable to DeSivo, the government and the probation office rely exclusively on the trial testimony of several witnesses.  As a result, the court must make credibility determinations regarding the testimony of these witnesses to ensure that the evidence proffered possesses "sufficient indicia of reliability to support its probable accuracy."

---

[3]  Defense counsel later conceded that the current law requires the preponderance standard, and wanted merely to preserve the objection in his memorandum.  We note the objection is overruled, but is preserved for appeal, if necessary.

U.S.S.G. § 6A1.3; United States v. Gibbs, 190 F.3d 188, 203 (3d. Cir. 1999).  In

addition to making the typical credibility determinations necessary to assess the

believability of a witness, the court must also consider any bias or interest a

witness may have regarding his or her testimony.  23 C.J.S. Criminal Law § 1490

(2006).  However, a "sentencing court may credit testimony that is 'totally

uncorroborated and comes from an admitted liar, convicted felon, or large scale

drug-dealing, paid informant.'" United States v. White, 360 F.3d 718, 720 (7th Cir.

2004) (internal citations omitted).

A court is also permitted to estimate the amount of drugs involved in a

particular operation.  Gibbs, 190 F.3d at 203.  Because doing so results in an

approximation, however, the court should "err on the side of caution when

choosing between two equally plausible estimates."  United States v. August, 86

F.3d 151, 154 (9th Cir. 1996).

The court will consider the testimony of each relevant witness separately,

determine the amount of methamphetamine attributable to DeSivo from each

witness, and then add each amount together to determine his base offense level

under the Sentencing Guidelines.

A. *Freeman Smith*

Freeman Smith was an experienced cook of methamphetamine.  During his

7

testimony, he described in detail how he manufactured the drug.  See Trial Tr. vol. 2, 98:23-99:21, August 17, 2005.  He testified that he learned from watching someone a couple times make methamphetamine, and then "picked it up from there."  Id. at 99:22-24.  Smith testified that he and DeSivo cooked methamphetamine between five and ten times at Smith's house and an additional three times at DeSivo's house.  See id. at 107:24-108:10.  During each of these cookouts, Smith stated that he and DeSivo would yield four ounces (113.4 grams) of methamphetamine by using a thousand pseudoephedrine pills.[4]  See id. at 108:11-20.  He also testified that he supplied DeSivo with methamphetamine between ten to twenty times, each time providing DeSivo with "an ounce to two or three or four ounces."  Id. at 109:6-22.  Based on this testimony, the government attributes between 30 to 60 ounces to DeSivo - 20 ounces for five instances in which Smith and DeSivo cooked four ounces, and ten ounces for the ten additional times Smith supplied DeSivo with methamphetamine.

DeSivo objects to this calculation, first arguing that it was impossible for Smith and DeSivo to produce four ounces of methamphetamine from a thousand pseudoephedrine pills.  To support this position, DeSivo introduced into evidence a lab report from the Drug Enforcement Agency (DEA), which DeSivo apparently

---

[4]  Pseudoephedrine pills include sudafed and the generic version of sudafed.

recovered from another criminal matter.   Obj. Hr'g Tr. 9-10.  Based on drug

precursors seized from DeSivo's vehicle in that matter, the DEA conducted lab

tests to determine the 100% theoretical yield of d-methamphetamine from 912

tablets of pseudoephedrine.  See Obj. Hr'g Tr. exhibit D-1, p. 3.  Using  a

hypothetical ratio of .920 of methamphetamine for each pure gram of

pseudoephedrine, the report indicates that 49.90 grams of methamphetamine were

possible from the 912 tablets of pseudoephedrine. DeSivo argues that because the

DEA was only able to theoretically yield 49.90 grams from 912 pills, it is

impossible for Smith and him to have actually produced more than twice that

amount - 113.4 grams (i.e. 4 ounces) - using just 88 more pills.

    We find Desivo's DEA lab report inconclusive.  Fatal for DeSivo is that the

report does not indicate whether the resulting "theoretical" methamphetamine

amount is actual methamphetamine or methamphetamine mixture.  If actual

methamphetamine, then the report would be wholly irrelevant as we are

determining DeSivo's sentencing range based on methamphetamine mixture.[5]

Without indicating whether it tested for actual or a mixture of methamphetamine,

the report is too ambiguous to have any bearing here.

---

    [5]  While we suspect that the resulting amount represents actual
methamphetamine, we do not formally find this to be the case.

Nevertheless, out of an abundance of caution, we find that Smith was able to yield only one ounce of methamphetamine per thousand pills of pseudoephedrine, instead of the four ounces Smith's testimony suggests. Testimony from other witnesses indicated that one ounce was the average a cook could yield from a thousand pills.  See Saxbury testimony, Trial Tr. vol. 2, 205:6-10 (indicating that he was able to get only an ounce of methamphetamine per thousand pills);  Talda testimony, Trial Tr. vol. 5, 87:8-16, August 22, 2005 (same); Moore testimony, Trial Tr. vol. 3, 33:6-21, August 18, 2005 (testifying able to get less than an ounce using between 700 to 1000 pills).  In fact, John Teneyck, who was familiar with cooking methamphetamine, testified that "if you know what you're doing, you can get an ounce out....if you're not real good, you are going to get less."  Trial Tr. vol. 3, 98:15-18.  While we recognize that Smith was an experienced cook, his claim that he was able to yield four times more than what a good cook could yield appears suspect in light of other witness testimony.  At most, his claimed high rate of return is equally plausible with the notion that he could only yield the one ounce return yielded by other cooks applying similar methods.  When facing two equally plausible estimates, we are constrained to err on the side of caution and give the defendant the benefit of the doubt.  Therefore, we find that Smith and DeSivo

yielded one ounce per thousand pills.[6]

DeSivo also argues that he only cooked with Smith four times.  We note that not only does Smith's testimony clearly indicate that DeSivo and Smith cooked at least five times, but that in fact the testimony supports eight times - five at Smith's house, and three at Desivo's residence.  DeSivo points to no contradictory testimony by either Smith or another witness.   Therefore, at least five times is attributable, if not more.

Finally, DeSivo argues Smith's testimony concerning his supplying activities is too speculative.  Specifically, DeSivo argues that the court should discount the number of times Smith supplied DeSivo because, when asked to estimate whether he supplied DeSivo more than six times, Smith stated the following:  "yeah probably.  I don't know, ten to 20 times, I'd say."  Trial Tr. vol. 2, 109:13-17.  DeSivo also argues as speculative Smith's testimony regarding the amount of methamphetamine he gave DeSivo because Smith prefaced the amount with the term "probably."

---

[6] On November 17, 2006, DeSivo requested funds to obtain a chemical expert, in part to determine whether it was possible for Smith and him to produce four ounces of methamphetamine per thousand pills.  <u>See</u> (Rec. Doc. No. 230); Obj. Hr'g Tr. 16-7.  We originally denied that motion.  (Rec. Doc. No. 234). DeSivo asked for reconsideration, which we also denied. (Rec. Doc. Nos. 236, 238).  In light of our decision today regarding Smith's testimony, DeSivo's request for a chemical expert, which we already denied, is now rendered moot.

DeSivo's arguments are unpersuasive.  The use of qualifiers do not relegate Smith's uncontradicted testimony to speculative status.  Instead, these qualifiers at worst suggest that Smith was estimating his and DeSivo's drug supplying activities, which the court, after hearing Smith on the stand and assessing his credibility as a witness,  considers credible enough to meet a preponderance of the evidence standard.  Therefore, we find that Smith supplied DeSivo at least ten times with an ounce (28.35 grams) of methamphetamine each time.

In sum, we will attribute 425.25 grams to DeSivo: 141.75 grams for five instances in which Smith and DeSivo cooked one ounce of methamphetamine (5 x 28.35 grams), and 283.5 grams for the ten instances Smith supplied DeSivo with at least an ounce of the drug (10 x 28.35 grams).

### B.  Mark Saxbury

During trial, Mark Saxbury testified that he met DeSivo through a mutual acquaintance named Billy Fenton.  Trial Tr. vol. 2, 165.  According to Saxbury, DeSivo supplied him with anyhdrous ammonia "like two to three times," which Saxbury used to make "about an ounce" of methamphetamine each time.  Id. at 168:14-169:24.  The government argues this testimony establishes that 2 to 3 ounces (56.7-85.05 grams) of methamphetamine should be attributed to DeSivo for sentencing purposes.  In contrast, DeSivo argues that this testimony fails to meet

the preponderance of the evidence standard, largely because Saxbury prefaced his statements "two to three times" and "an ounce" with the qualifiers "like" and "about," respectively.  See Obj. Hr'g Tr. 39:23-40:19.

As was the case for his similar argument regarding Smith's testimony, DeSivo's argument here is unpersuasive.  Like Smith, Saxbury's uncontradicted testimony is not rendered speculative simply because he prefaced his comments with qualifiers.  After assessing the credibility of the witness when on the stand, and keeping in mind the lower threshold the government needs to meet under a preponderance of the evidence standard, we conclude Saxbury's testimony properly attributes 56.7 grams (two ounces) of methamphetamine to DeSivo for sentencing purposes.

### C. Darin Moore and Orin Talda

Darin Moore, Orin Talda, and DeSivo cooked methamphetamine together on at least one occasion behind Darin Moore's residence.  Trial Tr. vol. 3, 32-33. Talda testified that normally he would get an ounce of methamphetamine from a thousand pills.  Trial Tr. vol. 5, 87:8-16.  The government, relying primarily on Orin Talda's testimony, argues that the group's cooking activities during this instance yielded one ounce (28.35 grams) of methamphetamine.  See Obj. Hr'g Tr. 43.  DeSivo does not dispute that this cooking instance occurred, but rather

13

challenges the amount yielded.  In support of his argument, he points to Darin

Moore's testimony, noting that Moore unequivocally stated that the group had

cooked "less than an ounce."  Trial Tr. vol. 3, 33:6-21.  When compared to Orin

Talda, who qualified his comments by stating that he "thinks" they cooked an

ounce, see Trial Tr. vol. 5, 84:15-6, DeSivo argues that attributing an ounce of

methamphetamine to this cooking instance would be too speculative.

   We agree with DeSivo.  Similar to Smith and Saxbury, Talda estimated the

amount of drugs manufactured.  Unlike Smith's and Saxbury's testimony,

however, testimony from another witness - Darin Moore - directly contradicts

Talda's testimony.  Moore unequivocally stated that this particular cooking

instance yielded less than an ounce.  Further, Moore testified that the group used

between 700 to 1,000 pills.  Because Talda testified that they yielded only an ounce

of methamphetamine per 1,000 pills, Moore's suggestion that the group may have

used fewer than 1,000 pills would support DeSivo's argument that this cooking

instance yielded less than an ounce of methamphetamine.  As a result, we find that

this cooking instance yielded less than an ounce of methamphetamine.

   To determine exactly how much less, we will estimate using the average

amount of methamphetamine these cooks were able to yield from a thousand pills,

which Talda testified was an ounce.[7]  Moore testified that in this particular cooking

instance the group used between 700 and 1,000 pills.  Because we are required to

give DeSivo the benefit of the doubt and be conservative in our estimates, we will

use the low end of 700 pills.  By using 30% fewer pills than normal, we estimate

this particular cooking instance yielded 30% less of methamphetamine than

normal.  Because these cooks typically yielded an ounce (28.35 grams) of

methamphetamine for 1,000 pills, we conclude that in this instance they yielded

70% of an ounce of methamphetamine, or 19.84 grams.

Talda testified to another cooking instance with DeSivo, this time behind

Talda's trailer with a woman named "Jessie."  See Trial Tr. vol. 5, 86:7-87:16.

During this instance, Talda and DeSivo yielded an ounce of methamphetamine.  Id.

Although DeSivo in his *pro se* objections challenges this amount, defense counsel

during oral argument conceded that this amount is attributable to DeSivo.  See Obj.

Hr'g Tr. 45-6.  Therefore, we will attribute 28.35 grams of methamphetamine to

DeSivo for this cooking instance.

Talda also testified that he received an eighth of an ounce of

methamphetamine every other day from DeSivo.  Trial Tr. vol. 5, 88:7-14.  DeSivo

---

[7]  Although we do not find Talda credible regarding how much the group
yielded in this specific cooking instance, we find his testimony credible regarding
the group's general yield from a thousand pills.

does not dispute this testimony, but instead argues that the trial transcript does not

reveal the length of the period during which Talda received this eighth of an ounce,

and therefore the whole testimony should be deemed speculative.  Obj. Hr'g Tr.

46-7.   The government disagrees, and argues that Talda testified that DeSivo

supplied Talda for at least six months.  Id. at 48-9.

The dispute revolves around the following testimony.  After testifying that

DeSivo would deliver the drugs to Talda's house, Talda and the prosecutor had the

following exchange:

> Q:    Do you know whether Chris DeSivo was working during this time
>        period you're telling us about when you were making meth and when
>        he was dropping it off at your house?
> A:    I really don't.  I mean, I got him a job with Empire Insulation.  We
>        were working together for, I don't know, six months.  I quit.  And I
>        don't know if he was still for Empire or not.
> Q:    Did there come a point when he stopped working at Empire with you?
> A:    I quit first.

Trial Tr. vol. 5, 89:21-90:5.

We agree with DeSivo that the above testimony does not support a finding that he

supplied Talda for six months.  Talda's testimony only establishes that he and

DeSivo worked together for six months.   It does not establish that during that time

DeSivo was supplying Talda with drugs.  He could have started to supply Talda

before they worked together, during, or after Talda quit his job.  Unfortunately, the

prosecutor never ascertained testimony clarifying the time period.  Without such

16

evidence, we find it too speculative to attribute any methamphetamine amounts to DeSivo for this supplying activity.

We attribute 48.19 grams of methamphetamine to DeSivo from Moore and Talda's testimony - 19.84 grams from the 700 pills DeSivo, Moore and Talda used in one cooking instance, and 28.35 grams for the ounce manufactured during one cooking instance with DeSivo, Talda and Jessie.

### D. Robert Jordan

Robert Jordan testified that he received between an eighth to a quarter of an ounce of methamphetamine from DeSivo at least ten times.  Trial Tr. vol. 5, 115:15-117:4.  Based on this testimony, the government attributes 7 grams to DeSivo for two of these ten times in which he supplied Jordan.  DeSivo concedes that he supplied this amount to Jordan.  Obj. Hr'g Tr. 52. Therefore, we will attribute 7 grams (2 x 1/8 ounce) to DeSivo for this supplying activity.

The government also attributes one ounce (28.35 grams) to DeSivo for an instance in which Jordan and DeSivo cooked "maybe an ounce, ounce and half" of methamphetamine.  Trial Tr. vol. 5, 117:13-118:24.  DeSivo argues this amount is too speculative, but does not suggest why or offer evidence supporting this argument.  We disagree, and find Jordan's testimony regarding this amount to be credible enough to meet the preponderance of evidence standard.

17

Therefore, we attribute 35.35 grams (7 + 28.35 grams) to DeSivo for his drug manufacturing and selling activities with Robert Jordan.

### E.  Jacob "Wig" White

Jacob White testified that he received methamphetamine from DeSivo every other day for at least a month.  Trial Tr. vol. 5, 129:19-131:1, 132:8-10.  In those instances, White stated he would receive "[s]ometimes an eight ball [eighth ounce].  Sometimes a quarter.  Sometimes half ounce."  Id. at 130:4-5.  DeSivo argues that because White was not sure exactly how much he received, White's testimony is too speculative to be attributable to DeSivo.  Obj. Hr'g Tr. 54-55.

We disagree.  White's testimony supports the fact DeSivo supplied White with at least an eighth of an ounce of methamphetamine every other day for a month.  Simply because White testified that DeSivo sometimes supplied him with more does not prevent the court from using the lower amount of an eighth of an ounce.  DeSivo offers no evidence to contradict this amount, and we find White's testimony to be credible.

Therefore, we will attribute 52.5 grams (15 x 3.5 grams) to DeSivo from White's testimony.

### F.  John Teneyck

John Teneyck testified that he received methamphetamine from DeSivo on

18

several occasions.  DeSivo concedes that he supplied Teneyck with a total of 63.7 grams of methamphetamine - twice with an eighth of an ounce (7 grams), and then two other times with an ounce each (56.7 grams). Obj. Hr'g Tr. 58:20-59:2. Teneyck also testified that DeSivo indirectly supplied him on four to six other occasions - two to three times with a quarter of an ounce through Scott Swackhammer, <u>see</u> Trial Tr. vol. 3, 69:10-70:4, and two to three times with an eighth of an ounce through Robert Jordan, <u>see id</u>. at 73:4-22.  DeSivo argues these amounts are too speculative because Teneyck received them indirectly.

We disagree.  Teneyck testified that he was in direct contact with DeSivo, and that he had an understanding with DeSivo that Swackhammer and/or Jordan would facilitate buys between Teneyck and DeSivo.  Trial Tr. vol. 3, 69:3-14; 71:11-15.  Such testimony is credible testimony that establishes Teneyck had personal knowledge that his indirect purchases came from DeSivo.

Therefore, we will attribute the following amounts to DeSivo for these indirect purchases - half an ounce (14 grams) for the two quarter ounce buys facilitated through Swackhammer, and a quarter of an ounce (7 grams) for the two eighth of an ounce buys facilitated through Jordan.  The total amount of methamphetamine attributable to DeSivo from Teneyck's testimony is 84.7 grams.

### G.  Mark Marcoccia

Mark Marcoccia testified that DeSivo supplied him with methamphetamine approximately ten to fifteen times.  <u>See</u> Trial Tr. vol. 3, 171:22-5, 174:4-16.  In those instances, DeSivo supplied Marcoccia with at least an eighth of an ounce, and on a couple of occasions DeSivo gave Marcoccia an ounce.  <u>Id</u>. at 174:4-16, 174:19-175:3.  Despite testimony justifying much more, the government asks the court to attribute only the two ounces (56.7 grams) Marcoccia received from DeSivo for those couple of occasions when he received more than an eighth of an ounce.  DeSivo argues that the testimony supporting this amount is too speculative.

We disagree.  When asked about the couple of times in which he received more than an eighth of an ounce, Marcoccia testified that he received "maybe an ounce at a time."  <u>Id</u>. at 174:25.  Marcoccia reaffirmed this amount.  <u>Id</u>. at 175:1-3.  Although he qualified his original answer with the word "maybe," we find, as we did for Smith and others, that his testimony is credible enough to meet the preponderance of the evidence standard.  We again note that DeSivo has not offered any contradicting evidence, and although the burden is on the government, we find that they have met this burden.

Therefore, we attribute 56.7 grams of methamphetamine from Marcoccia's testimony to DeSivo.

### I.  Ricky Johnson/Mark Worthington

Ricky Johnson testified that he received an ounce (28.35 grams) of methamphetamine from DeSivo through Mark Worthington.  DeSivo advances the same argument as he did for Teneyck, suggesting Johnson's indirect purchases are too speculative to attribute to DeSivo.  As was the case with Teneyck's testimony, we find Johnson's testimony credible on this point, and overrule DeSivo's objection.  Johnson testified that he accompanied Worthington to DeSivo's house, Worthington entered DeSivo's house, and came back with an ounce of methamphetamine.  Trial Tr. vol. 3, 10:10-11:4.  This testimony is enough to establish by a preponderance that DeSivo was the supplier of that ounce.

Therefore, we attribute 28.35 grams of methamphetamine to DeSivo from Johnson's testimony.

### J.  Chad Peters

Chad Peters testified that he worked on DeSivo's garage, and that DeSivo would at times repay him with methamphetamine.  Trial Tr. vol. 5, 51:19-53:4.  For two months, DeSivo paid Chad Peters at various times a gram a day of methamphetamine.  Id. at 54:3-19.  On several occasions they cooked the drug together, including two instances whereby DeSivo gave Chad Peters a couple of grams of methamphetamine.  Id. at 59:8-21. In addition, Peters testified that he had

partied 20-30 times with DeSivo, which sometimes included the use of methamphetamine supplied by DeSivo.  Id. at 59:22-60:13.  When asked what was the most methamphetamine he ever saw at DeSivo's house, Peters stated "I don't know.  Probably, I don't know, a half ounce probably.  Fifteen grams probably at the most."  Id. at 59:25-60:1.  Peters reaffirmed the fifteen gram amount later during his testimony.  See id. at 63:20-22.  As a result, the government argues fifteen grams is attributable from Peters' testimony.  DeSivo argues that the equivocal nature of Peters' testimony renders this amount speculative.

We again disagree with DeSivo, finding that, after taking into consideration all of Peters' testimony, fifteen grams is a credible amount to attribute to DeSivo.  Peters' testimony establishes that DeSivo was a frequent supplier of methamphetamine to Peters, with DeSivo sometimes paying Peters with methamphetamine for work done around DeSivo's house, and other times supplying Peters during the many parties the pair had.  In this context, Peters' assertion that he saw fifteen grams at DeSivo's house is credible, despite the equivocal language used by Peters to make this assertion.  Again, the government need only meet the preponderance of the evidence standard.  The relationship shared between Peters and DeSivo, coupled with the fact Peters reaffirmed his initial assertion of fifteen grams, is enough evidence to meet this standard.

Therefore, we attribute 15 grams of methamphetamine to DeSivo from this testimony.

### K.  Michelle Roberts

Michelle Roberts was the girlfriend of a gentleman named Billy Fenton.  She testified that she and her boyfriend would use an eighth of an ounce (3.5 grams) of methamphetamine a day, for four to six months.  Trial Tr. vol. 6, 10:22-4; 12:10-18, August 23, 2005.  She further testified that the drugs came from DeSivo.  Id. at 15:9-11.  DeSivo does not challenge that the drugs came from him, but rather argues that because Roberts stated she sometimes got more and sometimes got less than an eighth of an ounce, her testimony is speculative.  We again reject this argument, noting that Roberts' testimony amply supports the government's assertion that the whole amount testified to by Roberts should be attributed to DeSivo.

Therefore, we attribute 420 grams (120 days (4 months) x 3.5 grams = 420 grams) to DeSivo from Roberts' testimony.

### L.  Robert Landmesser

Robert Landmesser testified that DeSivo supplied him with methamphetamine indirectly through Kyle Frisbee.  Trial Tr. vol. 3, 134:21-25.  He also testified that he used methamphetamine with DeSivo.  Id. at 135:15-22.

23

Landmesser testified that on three separate occasions he received an ounce (28.35 grams) of methamphetamine from DeSivo through Frisbee.  Id. at 146:22-147:14. Landmesser also testified that he received on five different occasions at least a gram of methamphetamine in the same indirect manner.  Id. at 147:14-22.  Finally, he testified that he saw between one to two ounces of meth at DeSivo's residence. Id. at 135:15-136:4.  DeSivo argues that Landmesser's indirect purchases are too speculative.

Once again, we reject this argument.  Landmesser testified that Frisbee specifically told him that he could get from DeSivo as much meth as Landmesser wanted.  Id. at 146:22-25.  We find this testimony to be credible enough to meet the preponderance standard and establish that DeSivo was the source of Landmesser's drug purchases, in part because of the extensive evidence put on by the government regarding DeSivo's overall supplying activities.

Therefore, we attribute 118.4 grams of meth to DeSivo from Landmesser's testimony - 85.05 grams total for each ounce sold to Landmesser on three different occasions, 5 grams total for each gram sold to him on five different occasions, and the 28.35 grams he witnessed at DeSivo's residence.

The following table summarizes the amount of methamphetamine we attribute to DeSivo from each witness:

24

**Witness Totals**

Name                          Amount (grams)

| Name | Amount (grams) |
|------|----------------|
| Freeman Smith | 425.25 |
| Mark Saxbury | 56.7 |
| Darren Moore/Orin Talda | 48.19 |
| Robert Jordan | 35.35 |
| Jacob White | 52.5 |
| John Teneyck | 84.7 |
| Mark Marcoccia | 56.7 |
| Ricky Johnson/Mark Worthington | 28.35 |
| Chad Peters | 15 |
| Michelle Roberts | 420 |
| Robert Landmesser | 118.4 |
| **Total** | **1,341.14** |

As indicated, the total attributable amount is 1,341.14 grams of methamphetamine, which is less than the probation office's finding that more than 1.5 kilograms but less than 5 kilograms of methamphetamine was involved in DeSivo's methamphetamine conspiracy.  Under U.S.S.G. § 2D1.1(c)(4), 1,341.14 grams of methamphetamine results in a base offense level of 32, which we find is DeSivo's base offense level.

    2.    Leadership Enhancement

DeSivo also challenges the four level enhancement he received under the presentence report for his leadership role in the conspiracy.  U.S.S.G. § 3B1.1(a) requires a four level enhancement to a defendant's offense level "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  DeSivo argues that he was not a leader or organizer of anybody, and that he merely would, when needed, contact someone to help cook and/or distribute methamphetamine.  He further argues that his relationship with the various coconspirators was at best akin to an independent contractor, whereby he exerted no control or authority.  Obj. Hr'g Tr. 85-87.  The government disagrees, and argues that DeSivo was a leader and/or organizer because he would bank roll the illegal activity, line up the cooks, the ingredients, the buyers and suppliers, and generally was responsible for recruiting accomplices. Id. at 90-94.

To be considered an organizer or leader in the Third Circuit, "the defendant must have exercised some degree of control over others involved in the commission of the offense."  United States v. Heibling, 209 F.3d 226, 243 (3d Cir. 2000) (quoting United States v. Phillips, 959 F.2d 1187, 1191 (3d Cir. 1992)). Other factors considered include the decision-making authority of defendant, the nature of participation in the commission of the offense, the recruitment of

accomplices, the claimed right to a larger share of fruits of the crime, the degree of participation in planning or organizing the offense, and the nature and scope of the illegal activity.  U.S.S.G. § 3B1.1 cmt. 4.  Evidence of every factor is not a prerequisite for a finding under U.S.S.G. § 3B1.1.  United State v. Bates, 54 F.3d 125, 128 (3d Cir. 1995).  Rather, the court need only find sufficient authority to justify the enhancement.  Id. at 129.

Futher, the defendant must have organized or led one or more participants. U.S.S.G. § 3B1.1 cmt. 2.  A participant is defined as "a person who is criminally responsible for the commission of the offense, but need not be convicted." U.S.S.G. § 3B1.1 cmt. 1.

Based on testimony from more than a dozen witnesses, there is no question that there were at least five participants involved in DeSivo's conspiracy to manufacture and distribute methamphetamine.  Rather, the issue here is whether DeSivo led or organized at least one participant by exerting some degree of control over that person.  The government argues that at the very least DeSivo exercised sufficient control over his wife, Anne Marie DeSivo.

We agree.  Anne Marie DeSivo, at age 18, married the then 42-year old DeSivo one month before DeSivo's methamphetamine conspiracy began.  Trial Tr. vol. 3, 186; vol. 4, 81:13-17, August 19, 2005.  Prior to her marriage, Mrs. DeSivo

had never tried methamphetamine, nor was involved in the methamphetamine trade.  Trial Tr. vol. 71:10-23.  As Mrs. DeSivo testified, she "always believed what [DeSivo told her] and done [sic] everything he has said for [her] to do."[8]  Id. at 41:10-13.  Mrs. DeSivo's primary job was to obtain the ingredients necessary to manufacture methamphetamine - sudafed pills, batteries, ether, roto, etc.  Trial Tr. vol. 3, 193:6-11; see also Smith testimony, Trial Tr. vol. 2, 103 (stating that Mrs. DeSivo supplied the pills); Moore testimony, Trial Tr. vol. 3, 39 (stating that DeSivo would direct his wife to get the pills).  Sometimes, DeSivo would give her money he earned from prior sales of methamphetamine to help her purchase these ingredients.  Trial Tr. vol. 3, 190:2-18.  Other times she would steal for him.  Id. at 191:11-15.  In a video taken while the couple was hiding out, DeSivo refers to his wife as "my chief cook," which Mrs. DeSivo stated meant she was his sidekick. Id. at 204:1-205:5; Trial Tr. vol. 4, 62:23-63:22.

This testimony establishes that DeSivo exerted sufficient control over the actions of Mrs. DeSivo, who would do anything he asked, which included purchasing and stealing ingredients used to manufacture methamphetamine.

_____

[8] Although this answer was in response to a specific question concerning another charge - DeSivo's attempt to obstruct justice by having Mrs. DeSivo lie on his behalf - her response describes the general relationship shared by the couple. See also id. at 30:22 ("I always just did what Chris wrote to me.").

DeSivo's own words suggest she was treated like an employee, as she was his "chief cook" for methamphetamine.  Not only was he responsible for directing her actions, he was responsible for recruiting her as an accomplice, as she was never involved in the methamphetamine trade prior to her marriage to him.  By recruiting his wife into the methamphetamine trade and proceeding to exert considerable control over her involvement in his methamphetamine manufacturing endeavors, DeSivo acted as an organizer and leader of at least one participant in his conspiracy.

DeSivo's sentencing memorandum implicitly argues that to qualify for the four level enhancement, DeSivo must be found to have organized or led at least five participants, not merely one.  This interpretation of U.S.S.G. § 3B1.1(a), however, is not only unsupported by the guideline's language and commentary, but is contradicted by caselaw.

U.S.S.G. § 3B1.1(a)'s language is clear.  It states the defendant must have a leadership role in the criminal activity only.  Even though that activity must involve at least five participants, U.S.S.G. § 3B1.1(a) does not state that the defendant must have led or organized all five or more participants.  The guideline could have done so by switching "criminal activity" and "five or more participants," thereby having section 3B1.1(a) read as follows: "if the defendant

29

was an organizer or leader of five or more participants involved in a criminal activity...."  U.S.S.G. § 3B1.1(a) is not worded in this manner, however.  Instead, section (a)'s explicit language demonstrates that the defendant need not be a leader or organizer of five or more participants to qualify for a four level enhancement.

This interpretation is further supported by comment 2 of U.S.S.G. § 3B1.1. Comment 2 states that "[t]o qualify for an adjustment under [section 3B1.1], the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  By its terms, comment 2 is intended to be read in conjunction with all of section 3B1.1.  Reading section 3B1.1(a) and comment 2 together, a defendant will qualify for a four level enhancement when leading or organizing *at least one participant* in criminal activity involving five or more participants.

This interpretation has been adopted by several courts.  See United States v. Antillon-Castillo, 319 F.3d 1058, 1060 (8th Cir. 2003) (noting that a defendant need not lead all other participants in order to be a leader under section 3B1.1(a)); United States v. Mijangos, 240 F.3d 601, 604 (7 th Cir. 2001) (interpreting section 3B1.1(a) as requiring a defendant to have organized or in some way directed another member of the conspiracy); see also United States v. Morris, 1998 U.S. App. LEXIS 10139, at *4 (4 th Cir. 1998) (unpublished) (holding that section

30

3B1.1(a)'s language "does not require that a defendant have direct control or supervisory power over five or more independent conspirators", and quoting comment 2 to stand for the proposition that a defendant need only lead one participant to qualify for the four level enhancement).  DeSivo's argument suggesting that section 3B1.1(a) requires that a defendant lead or organize five or more participants runs counter to section 3B1.1(a)'s language, comment 2, and the relevant caselaw.

Because we find that DeSivo led and organized his wife - a participant in the conspiracy that included five or more participants - DeSivo is subject to a four level enhancement under U.S.S.G. § 3B1.1(a). We adopt the presentence report on this point, and add four offense levels to DeSivo's base offense level of 32, resulting in an offense level of 36.

3.    <u>Weapons Possession and Obstruction of Justice</u>

In his *pro se* written objections, DeSivo argues that the presentence report improperly assessed enhancements for his obstruction of justice conviction and weapons possession conviction.  For each conviction, he received a two level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) and U.S.S.G. § 3C1.1, respectively.  DeSivo argues that there was not sufficient evidence to support these enhancements.

This argument has no merit.  We note that a jury, deliberating under a beyond a reasonable doubt standard, convicted DeSivo for both weapons possession and obstruction of justice.  After reviewing the evidence independently under a much lower preponderance standard, we agree with the jury verdict and therefore find the presentence report properly granted DeSivo a total four level enhancement for his weapons possession and obstruction of justice convictions.  This brings his total offense level to 40.

    4.   <u>Criminal History</u>

DeSivo argues, again in his *pro se* written objections, that the presentence report incorrectly stated his criminal history category as a category VI.  Specifically, DeSivo objects to paragraphs 57-60 and 62-65 in the presentence report.  We will discuss each main objection in turn.

Pursuant to U.S.S.G. § 4A1.1(a), paragraphs 57 and 58 of the presentence report awarded a total of six criminal history score points to DeSivo.  In paragraphs 17 and 18 of his original objections, DeSivo argues this is a miscalculation because the convictions described in paragraphs 57 and 58 were unclassified misdemeanors.  He also argues that paragraph 57 does not accurately reflect information from relevant official court records, and that paragraph 58 misconstrues the actual charge upon which he was convicted.

None of his arguments has any merit because it is the maximum sentence that determines the number of criminal history points awarded under U.S.S.G. § 4A1.1(a), not simply the charge or its classification.  U.S.S.G. § 4A1.1(a) directs a court to attribute 3 points to defendant's criminal history score for "each prior sentence of imprisonment exceeding one year and one month."  The phrase "sentence of imprisonment" refers to the maximum sentence imposed.  U.S.S.G. § 4A1.2(b)(1).  Both paragraphs 57 and 58 describe crimes that qualify for U.S.S.G. § 4A1.1(a)'s three point enhancements because each crime resulted in maximum sentences of more than a year and one month - the conviction in paragraph 57 resulted in a 3 year maximum sentence, and the two convictions detailed in paragraph 58 resulted in maximum sentences of 3 and 4 years, respectively.[9] Because DeSivo does not challenge the accuracy of these sentences, the presentence report accurately attributes six total points.  Whether or not the report accurately reflected the charge or its classification has no bearing here, and therefore DeSivo's objections to paragraphs 57 and 58 are overruled.

DeSivo objects to paragraph 59 of the presentence report, arguing that the report should have calculated 1 criminal history point instead of 3 points for a

---

[9]  The two sentences described in paragraph 58 are treated as one sentence for calculating DeSivo's criminal history score because they were imposed in related cases.  <u>See</u> U.S.S.G. § 4A1.2(a)(2).

conviction resulting in a sentence of 48 hours to 23 months, 29 days of imprisonment.  As mentioned above, criminal history points are based on the maximum sentence of a crime.  Here, the presentence report correctly determined that the maximum sentence of 23 months, 29 days resulted in 3 criminal history points for DeSivo.  Therefore, DeSivo's objection to paragraph 59 is overruled.

DeSivo objects to paragraph 60 of the presentence report, arguing that it incorrectly attributed 1 criminal history point to him for a Driving While Alcohol Impaired conviction that resulted in a fine only.   U.S.S.G. §§ 4A1.1© and 4A1.2(c)(1), however, suggest otherwise and support the presentence report's calculations.  Section 4A1.1© directs a court to add 1 criminal history point for offenses that do not result in imprisonment.  Section 4A1.1(c)(2) further explains that misdemeanors that do not fall within certain exceptions may be counted under Section 4A1.1©.  Because Driving While Alcohol Impaired does not fall within any of the enumerated exceptions, the presentence report correctly attributed 1 criminal history point.  Therefore, we also overrule DeSivo's objection to paragraph 60.

Finally, DeSivo objects to paragraphs 62-65 of the presentence report, arguing the points awarded in these paragraphs stem from facts that were not properly placed in front of the jury, which DeSivo argues conflicts with the

34

Supreme Court's holding in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).

Paragraphs 63 and 64 add three total criminal history points to DeSivo's base

criminal history score of 16 - two points because DeSivo was on parole while the

offense occurred, <u>see</u> U.S.S.G. § 4A1.1(d); and one point because DeSivo

committed the instant offense less than two years after being released from

imprisonment, <u>see</u> U.S.S.G. § 4A1.1(e).  Neither <u>Apprendi</u> nor any other federal

case holds that facts supporting these additional calculations have to be put in front

of the jury.  In fact, the facts supporting these additions, which are facts concerning

DeSivo's prior criminal acts, may in some circumstance not even be permitted to

reach the jury.  <u>See</u> F.R.E. 404(b).  Indeed, the practice of the federal courts have

been to consider these issues at the sentencing stage regardless of whether they

were in front of the jury at the trial stage.  As a result, DeSivo's objections to

paragraph 63 an 64 are also overruled.

As for his objections to paragraphs 62 and 65, we also overrule them.  Those

paragraphs are not substantive, but rather simply reiterate the criminal history score

sums for both DeSivo's base criminal history score (16) and his final score (19).

We conclude that the presentence report accurately calculated both numbers.  His

total criminal history score of 19 results in a criminal history category of VI.

In summary, DeSivo's total offense level is 40 and his criminal history

35

category is VI, which results in a 360 months to life sentencing guideline range.

Although the presentence report calculated a higher total offense level (42), the

sentencing guideline range is the same.  As mentioned before, DeSivo's downward

departure requests are overruled because they include arguments more appropriate

for consideration under the factors enunciated in 18 U.S.C. § 3553(a).  We will

schedule sentencing, and at that point the court will consider DeSvio's arguments

that are relevant to the factors in 18 U.S.C. § 3553(a).


    s/ James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,  :
        :    CRIMINAL NO. 4:04-CR-10
    v.       :
        :    (Judge McClure)
CHRISTOPHER P. DeSIVO  :

**O R D E R**

January 9, 2007

For the reasons set forth in the foregoing memorandum,

**IT IS ORDERED THAT**:

1.    DeSivo's advisory sentencing guideline range is 360 months to life

imprisonment based on a total offense level of 40 and a criminal

history category of VI.

2.    Sentencing is scheduled for January 24, 2007 at 10:00 a.m. in

Courtroom No. 3, Third Floor, Federal Building, 240 West Third

Street, Williamsport, Pennsylvania.

           s/ James F. McClure, Jr.
           James F. McClure, Jr.
           United States District Judge